[No. 24912.   Department Two.   July 18, 1934.]

C. I. T. CORPORATION, *Respondent*, v. ASAL STRAIN
*et al., Appellants.*[1]

[1]Reported in 34 P. (2d) 440.

*Henry T. Ivers,* for appellants.

*Eggerman & Rosling,* for respondent.

BLAKE, J.—Pursuant to Rem. Rev. Stat., § 378, the above named parties presented an agreed case to the superior court of King county. After hearing, judgment was entered in favor of C. I. T. Corporation for $5,130.77 and costs. Strain and Testu appeal.

The essential facts giving rise to the controversy may be summarized as follows: In June, 1930, Strain and Testu purchased, under conditional bills of sale, two trucks from Fageol Motor Sales Company (which will hereafter be referred to as Fageol). In September, 1931, while there was still a small balance due to Fageol on each of the contracts, Strain and Testu sold the trucks—one to one Baldridge, the other to one Bolin.

These sales were handled in the following manner: Fageol, as vendor, executed conditional bills of sale to Baldridge and Bolin, respectively. The principal sum payable under each contract was $6,972.50, with the acknowledgment on each of a $2,000 down payment. The balance on each contract was payable in eighteen monthly installments of $276.25. These contracts were executed on printed forms used by C. I. T. Corporation (hereafter referred to as C. I. T.), which was an extensive dealer in automobile paper. On the back of each contract, there was a printed form of assignment designed for the dealer to execute to C. I. T. Beneath this, in typewriting, on each contract appears the following:

"We, the undersigned, do hereby guarantee payments to be made as by the within contract provided, for which payments we bind ourselves, our heirs, executors, administrators and assigns.

"(Signed) A. STRAIN,
"H. J. TESTU."

Thereafter, with the approval of Strain and Testu, Fageol assigned the contracts to C. I. T. These assignments were made by typewritten instruments attached to each contract, leaving the printed form of assignment on the back of the contracts unexecuted.

At the time the contracts were assigned, there was a total due on them of $9,392.50. The amount actually advanced by C. I. T. to Fageol was $6,438.58. The total amount of the discount on them, however, was $7,735—C. I. T. holding back ten per cent of that amount as security, and making financing charges of $522.92. Strain and Testu, therefore, had an equity in the contracts of $2,431. Upon this basis, they would have been entitled to a reassignment of the contracts upon the payment to C. I. T. of the principal amount of the discount, with interest. C. I. T., however, had been financing Fageol's contracts for several years under a general financing agreement, whereby each and every contract assigned by the latter to the former became security not only for the amount advanced upon the particular contract, but security also for any general balance due from Fageol to C. I. T. Of the $6,438.58 paid by C. I. T. to Fageol, the latter retained the amount of the balances due from Strain and Testu on the original contracts executed in June, 1930. The remainder was turned over to Strain and Testu.

There is much said in the briefs concerning the title to the trucks after these transactions were consummated. We do not think it necessary to go into that question further than to say that Fageol then ceased to have any interest in the trucks or in the payments thereafter due from Baldridge and Bolin under the contracts. C. I. T., however, had no notice of Strain's and Testu's connection with the transactions other than as guarantors of the Baldridge and Bolin contracts. C. I. T. had no notice that Fageol, in execut-

ing the Baldridge and Bolin contracts, was acting in the capacity of agent for Strain and Testu.

The story might have ended here, but for the fact that Fageol went into bankruptcy, owing C. I. T. an amount much in excess of the balance due the latter on the Baldridge and Bolin contracts. Baldridge and Bolin, after paying $4,420 to C. I. T. under the terms of the contracts, defaulted. Strain and Testu repossessed the trucks and inquired of C. I. T. the balance due it on the contracts. They were informed that the amount was $2,491.96. However, when Strain and Testu tendered that amount, C. I. T. declined to accept it.

C. I. T. takes the position that, under the general financing agreement with Fageol, it was entitled to collect the full amount due on the face of the Baldridge and Bolin contracts. In other words, it claims the right not only to collect on those contracts the amount for which it discounted them, with interest, but also the right to collect the balance due above that amount and apply such balance on the general indebtedness of Fageol. The trial court adopted this view, and entered judgment for C. I. T. in the sum of $5,130.77. If this judgment is sustained, C. I. T. will have received $10,-847.19 on its original investment of $6,438.58. If Fageol had been the real party in interest in the Baldridge and Bolin contracts, the legal justification for this result would be clear. Since, however, Strain and Testu were the real parties in interest in those contracts, we see no legal justification for taking $2,431 of their money (the face value of their equity in the contracts at the time of the assignment) and applying it on the debt of Fageol to C. I. T.

Submitting a supplemental list of authorities, counsel for respondent say:

"We are not endeavoring to hold Strain and Testu liable on the contract made by their agent. We are endeavoring to hold them liable in their capacity as guarantors . . ."

The guaranty, however, was to Fageol and not to C. I. T. A guaranty is not negotiable. 28 C. J. 942; *Eastern Townships Bank v. St. Johnsbury & L. C. R. Co.,* 40 Fed. 423. It may be conceded that a guaranty is assignable, and that an assignment of the debt guaranteed transfers to the assignee the assignor's rights against the guarantor. But the right of the assignee against the guarantor can be no greater than was his assignor's. As we have seen, Fageol has been paid. It has no enforcible rights under the guaranty against Strain and Testu.

But respondent contends that the guaranty in legal effect ran to it as well as to Fageol. On its face, the guaranty does not. Had the printed form of assignment on the back of the contract, under which the guaranty was typewritten, been executed, there would be some basis for this contention. As it is, the only theory upon which such a contention can be predicated is estoppel. In support of this theory, respondent contends that the very purpose of appellants and Fageol in handling the sale of the trucks to Baldridge and Bolin as they did was to discount the contracts to C. I. T.; that the guaranty was made for the purpose of inducing C. I. T. to discount the contracts; that, but for the guaranty, C. I. T. would not have discounted them.

Conceding all this, there is still lacking one essential element of estoppel, namely, injury to C. I. T. as a consequence of the conduct of appellants. *Hughes v. New York Life Ins. Co.,* 32 Wash. 1, 72 Pac. 452; *Spokane Valley State Bank v. Murphy,* 150 Wash. 640, 274 Pac. 702. If respondent is awarded the amount

tendered by appellant ($2,491.96), it will have received, all told, as a result of the transaction, $8,208.38. It seems clear to us that respondent has suffered no injury by discounting the contracts. On the contrary, it has made a fair profit on the transaction. Under the circumstances, we do not see how C. I. T., in discounting the contracts, was in any degree misled to its injury by the conduct of appellants.

The judgment will therefore be modified, and the cause remanded with directions to enter judgment in favor of C. I. T. Corporation in the sum of $2,491.96.

BEALS, C. J., GERAGHTY, TOLMAN, and HOLCOMB, JJ., concur.

